IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:14-CR-273-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| JAMES WILBERT WILLIAMS, ) | |
| ) | |
| Defendant. ) | |

This case comes before the court on defendant's motion to suppress (D.E. 59). Defendant did not file a separate memorandum in support of his motion, but rather essentially incorporated a memorandum into the motion itself. The government filed a response (D.E. 67). The motion was referred to the undersigned for an evidentiary hearing and a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 15 Dec. 2015 Docket Entry immediately preceding D.E. 68). The parties declined to file supplemental briefs following the hearing. (D.E. 73, 76). For the reasons stated below, it will be recommended that defendant's motion be denied.

**PROCEDURAL BACKGROUND**

On 27 October 2014, defendant was charged by criminal complaint with the offense of possession of a firearm (*i.e.*, a Glock .40 caliber pistol) by a convicted felon on 24 October 2014 in violation of 18 U.S.C. § 922(g)(1). (*See* D.E. 1). He was indicted for this offense on 20 November 2014. (*See* D.E. 13).

On 8 November 2015, defendant filed the instant motion to suppress. The motion seeks suppression of all evidence taken during and derivative from a traffic stop that led to the charge

against defendant, including the statements made by defendant to police after his arrest. On 2 March 2016, the undersigned conducted an evidentiary hearing on defendant's motion. (*See* D.E. 71).

At the hearing, the government presented the testimony of the police officers effecting the traffic stop, Ernest Powers ("Powers"), Chelsea Sanders ("Sanders"), and David Seagroves ("Seagroves"), as well as the police officer who interviewed defendant after his arrest, Jason Corprew ("Corprew"). Defendant presented the testimony of Jerry Wiggs ("Wiggs"), a private investigator. The court admitted the 12 exhibits offered by the government without objection by defendant, and 3 exhibits offered by defendant without objection by the government, as follows: maps of the neighborhood in which the traffic stop took place (Gov.'s Exs. 1 (D.E. 72-1), 1A); photographs of the residence where officers first observed defendant on the night of the traffic stop (Gov.'s Exs. 2 (D.E. 72-5), 3 (D.E. 72-6)); photographs of the area in which the traffic stop was conducted (Gov.'s Exs. 4 (D.E. 72-7), 5 (D.E. 72-8), 6 (D.E. 72-9)); a photograph of the handgun found in defendant's possession (Gov.'s Ex. 7 (D.E. 72-10)); several forms signed by or read to defendant in the course of his interview after arrest (Gov.'s Exs. 8 (D.E. 72-11), 9 (D.E. 72-12), 10 (D.E. 72-13)); photographs of the car in which defendant was a passenger at the time of the traffic stop (Gov.'s Exs. 11 (D.E. 72-14), 12 (D.E. 72-15); Def.'s Exs. 1A (D.E. 72-2), 1B (D.E. 72-3), 1C (D.E. 72-4)); a DMV vehicle identification printout concerning the same vehicle (Def.'s Ex. 2 (D.E. 72-16)); and a video ("Video")[1] taken by a private investigator while driving around the area where defendant was first observed and the area where the traffic stop occurred (Def.'s Ex. 3). The entire Video was shown during the direct examination of Wiggs, and a portion was shown again during the redirect examination of Wiggs.

---

[1] All citations herein to the Video are to the time stamp in minutes and seconds (*e.g.*, "00:00") appearing in the player on which the court viewed the Video, Windows Media Player. There is no time stamp embedded in the Video.

# FINDINGS OF FACT

After careful consideration of all the evidence of record on defendant's motion, the court makes the following findings of fact:

## I. THE TRAFFIC STOP

At all times relevant to defendant's motion, Powers, Sanders, and Seagroves were officers with the Wilson Police Department and were assigned as narcotics detectives. (Transcript of Hearing ("Tr.") (D.E. 74) 5:12 to 6:22; 60:15 to 61:16; 75:6 to 76:3). Corprew is an officer with the Wilson Police Department, deputized to the Raleigh office of the Drug Enforcement Administration since October 2013. (Tr. 96:3-18). On the night of 24 October 2014, Powers, Sanders, and Seagroves were patrolling the area surrounding Lane Street and Rountree Avenue in Wilson, focusing on the one-story, single family brick home of Betty Gaskins on Rountree Avenue ("the Gaskins residence"), known to them as a frequent venue for the sale of illegal liquor and crack cocaine. (Tr. 7:16 to 8:19; 15:15-19; 62:8-17; 76:1-11; Gov.'s Ex. 2). The officers were patrolling in an unmarked black Jeep Cherokee, with Powers driving, Seagroves in the front passenger seat, and Sanders in the rear passenger seat on the right of the vehicle. (Tr. 64:5-9; 70:16-17; 74:3-4; 76:12-17).

As the officers approached the Gaskins residence, they observed defendant exiting a silver Chrysler Sebring ("the Chrysler") parked in front of the Gaskins residence and approaching the front porch of the house. (Tr. 11:1-13; 62:19-21; 77:6-12). The area in front of the Gaskins residence was illuminated by a street light positioned directly in front of the house, as well as a light on the front porch. (Tr. 16:15-18; 17:3-5; 77:13-16). Powers, Sanders, and Seagroves were all familiar with defendant through other narcotics investigations. (Tr. 11:14-19; 62:22 to 63:4; 76:18 to 77:1).

3

After the officers observed defendant approaching the Gaskins residence, Powers continued driving past the Gaskins residence, turned right at the next intersection, and circled the block. (Tr. 12:1-8; 12:25 to 13:9; 13:22 to 14:4). As he did so, the officers called for another officer to check the police database to see whether or not defendant had any outstanding arrest warrants. (Tr. 12:1-8; 53:3 to 56:8; 77:17-25). Such a warrant check is a matter of standard procedure upon recognizing known individuals in areas with high levels of narcotics activity. (Tr. 12:9-13). Another officer responded to inform them that defendant had an active warrant for his arrest as a habitual felon. (Tr. 12:14-17; 78:6-9). The process of circling the block and checking defendant's warrants took approximately one minute. (Tr. 14:12-14).

As Powers turned back onto Rountree Avenue, the officers observed the Chrysler pulling away from the Gaskins residence. (Tr. 15:6-11; 78:10-16). While passing the Gaskins residence for the second time, the officers observed that defendant was not on the front porch or in the front yard. (Tr. 15:13-14). Powers followed the Chrysler as it turned left from Rountree Avenue onto Newbern Street, continuing south along Newbern Street to the intersection with Ward Boulevard, then turning right onto Ward Boulevard. (Tr. 18:23 to 19:9). While on Ward Boulevard, Powers pulled into the left lane alongside the Chrysler, and the officers were able to identify defendant as the front seat passenger in the Chrysler through its back window and rear, side windows. (Tr. 19:24 to 20:3; 20:16-22; 26:11-14; 21:17 to 22:2; 63:18-22; 79:7-19).

After the officers identified defendant, Powers slowed, pulled in behind the Chrysler, and initiated a traffic stop for the purpose of arresting defendant on the outstanding warrant. (Tr. 20:16-22). While behind the Chrysler, Powers observed defendant moving around in his seat in a manner that, based on prior observations of defendant by Powers, was consistent with his hiding narcotics in his pants. (Tr. 24:12-17).

## II. ARREST AND SEARCH OF DEFENDANT

After the Chrysler pulled over, Sanders and Seagroves approached the car, while Powers remained in the Jeep Cherokee. (Tr. 25:14-22; 80:4-6). The officers had defendant step out of the car, advised him of the warrant for his arrest, and placed him in handcuffs. (Tr. 64:10-14; 80:7-15). After placing defendant in handcuffs, the officers conducted a pat-down search of defendant's person for officer safety purposes. (Tr. 64:21-23; 65:24 to 66:9; 81:2-11). The pat-down search revealed a bag of marijuana in defendant's right front pocket. (Tr. 64:25 to 65:2; 81:12-15). After patting defendant down, the officers placed defendant in the unmarked Jeep Cherokee and transported him to the Wilson Police Department. (Tr. 66:24 to 67:4; 68:2-5).

Once they arrived at the police station, the officers began processing defendant, which included a further search conducted by Seagroves. (Tr. 27:6-16; 82:10-25). In the course of conducting the search, Seagroves located a gun in the bottom of one of defendant's pant legs. (Tr. 83:1-7). Seagroves notified Powers and Sanders, who entered the search room, seized the gun, and made it safe. (Tr. 27:14 to 28:6; 68:6-24; 83:24 to 84:16). They then notified Corprew, who was already involved with an ongoing investigation regarding defendant, and who had the federal credentials necessary to swear to a criminal complaint for a violation of 18 U.S.C. § 922(g)(1). (Tr. 28:7-25; 29:15 to 30:1).

## III. DEFENDANT'S STATEMENTS

When Corprew arrived at the police station, he advised defendant of his *Miranda* rights. (Tr. 86:18 to 87:14). Seagroves served as a witness to the *Miranda* advisory. (Tr. 87:10-16). The *Miranda* warning was given using the Wilson Police Department's form (Gov.'s Ex. 10), which enumerates the components of the warning and gives the defendant an opportunity to respond to each listed point in turn. (Tr. 86:7-14; *see* Gov.'s Ex. 10). When asked if he

5

understood his rights, defendant responded in the affirmative each time. (Tr. 88:11-17; 98:17-18). As each *Miranda* component was read, Corprew memorialized defendant's answers by writing "yes" on the line next to each statement, followed by a slash to create a space for defendant to acknowledge his understanding of each warning by signing his initials. (Tr. 100:8 to 102:12). Defendant refused to do so, or to sign the form after the entire *Miranda* warning had been given. (Tr. 87:24 to 88:10; *see* Gov.'s Ex. 10). Neither Seagroves nor Corprew threatened defendant in any way, made any promises in exchange for defendant's statements, or performed any other action to coerce defendant into making a statement. (Tr. 89:10-18; 116:5-19). Defendant did not appear intoxicated, and neither Seagroves nor Corprew had any reason to believe that he did not understand his rights. (Tr. 88:25 to 89:9; 102:22 to 103:19).

Before proceeding with the interview, Corprew advised defendant of the DEA's policy that interviews should be recorded if equipment is available and the defendant consents (*see* Tr. 105:18-24), but defendant stated that although he wished to cooperate with law enforcement, he would not consent to being recorded. (Tr. 98:19-22). Because Corprew did not have access to the DEA recording declination form (Gov.'s Ex. 8) that night, he accepted defendant's oral declination and proceeded with the interview. (Tr. 107:21-25). The next day, Corprew obtained the form and presented it to defendant, and defendant signed the form. (Tr. 111:16 to 114:7; *see* Gov.'s Ex. 8).

## DISCUSSION

By his motion, defendant seeks suppression of all evidence obtained as a result of the traffic stop and search of his person, including his statements to police following his arrest. Defendant's principal challenges to the search are that: (1) the officers did not have reasonable

6

Case 5:14-cr-00273-FL   Document 77   Filed 06/02/16   Page 6 of 15

suspicion to justify the traffic stop; and (2) that defendant did not waive his *Miranda* rights on the night of his arrest. The court will examine each of defendant's contentions in turn below.

## I. THE TRAFFIC STOP

### A. Applicable Law

The Fourth Amendment to the United States Constitution protects "against unreasonable searches and seizures." U.S. Const. amend. IV. While "not all personal intercourse between policemen and citizens involves 'seizures' of persons," when "a police officer accosts an individual and restrains his freedom to walk away, he has ' seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16, 19 n.16 (1968). However, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30); *see also United States v. Williams*, No. 11-4414, 2011 WL 4866760, at *1 (4th Cir. 14 Oct. 2011). "Investigatory stops are also permissible if the officers act on a reasonable suspicion that the person stopped was involved in a completed crime." *United States v. Basey*, 816 F.2d 980, 988 (5th Cir. 1987). Further, if an officer believes that the person is armed, he may pat the person down, or "frisk" him, for weapons. *Terry*, 392 U.S. at 30.

"'The reasonable suspicion standard is an objective one, so we examine the facts within the knowledge of [the officers] to determine the presence or nonexistence of reasonable suspicion.'" *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011) (quoting *United States v. Digiovanni*, 650 F.3d 498, 511 (4th Cir. 2011); *see also United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior, and it is measured by the totality of the circumstances." *Powell*, 666 F.3d at 186 (internal quotation marks and citations omitted). The

reasonableness of suspicion must be measured by what the officers knew before they conducted the stop. *See id.* (citing *Florida v. J.L.*, 529 U.S. 266, 271 (2000)); *see also Williams*, 2011 WL 4866760, at *1 ("Whether there is reasonable suspicion to justify the stop depends on the totality of the circumstances, including the information known to the officers and any reasonable inferences to be drawn at the time of the stop.").

When, as here, a defendant's motion to suppress challenges the constitutionality of an investigatory stop, the government has the burden to prove by a preponderance of the evidence that the stop was lawful. *See United States v. Cauthen*, 669 F. Supp. 2d 629, 633 (M.D.N.C. 2009) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 454-55 (1971)); *see also United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). "[A]lthough the standard of proof 'is obviously less demanding than that for probable cause,' the government 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" *Powell*, 666 F.3d at 186 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The Fourth Amendment requires the suppression of evidence that is the fruit of an unlawful stop. *United States v. May*, No. 10-4053, 2011 WL 4379301, at *3 (4th Cir. 21 Sept. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

**B.   Analysis**

Defendant asserts that the traffic stop was unlawful on the grounds that the officers did not have reasonable suspicion that defendant was a passenger in the Chrysler before initiating the traffic stop. The court finds defendant's argument without merit.

The three officers who participated in the traffic stop all testified that they were familiar with defendant from past investigations (Tr. 11:14-19; 62:22 to 63:4; 76:18 to 77:1) and that they each personally observed defendant on the night of the traffic stop as he exited the Chrysler and

approached the front porch of the Gaskins residence (Tr. 11:1-13; 62:19-21; 77:6-12). Though this observation took place at night, the area in front of the Gaskins residence was sufficiently lit to enable them to identify defendant. (Tr. 16:15-18; 17:3-5; 77:13-16). Although the Video shows the area in front of the Gaskins residence to be very dark, (*see* Video 00:10-00:39), the court does not find this depiction accurate in view of the poor image quality of the Video as well as the evidence substantiating that the area was well lit.

Defendant argues that once the officers lost visual contact with defendant after passing the Gaskins residence the first time, they no longer had reasonable suspicion, only a "mere hunch," that he would return to the Chrysler. The court disagrees. Having already observed defendant exiting the passenger side of the Chrysler, the officers had reason to believe that he was using the Chrysler for travel that night. Upon observing the Chrysler pulling away from the Gaskins residence as they turned the corner back onto Rountree Avenue after circling the block, and after seeing that defendant no longer appeared to be on the premises of the Gaskins residence, the officers made the reasonable inference that defendant may have returned to the Chrysler. The officers then took the additional steps of following the Chrysler, pulling alongside it, and then looking into it to confirm that defendant was in fact the passenger inside before initiating the traffic stop.

Defendant challenges the officers' second identification, arguing that between the tint on the Chrysler's windows and the lighting conditions on Ward Boulevard at the time immediately prior to the traffic stop, the officers could not have reliably identified defendant as the passenger in the Chrysler before making the traffic stop. In support of this contention, defendant relies upon the Video (Def.'s Ex. 3), the testimony of private investigator Wiggs, and a set of photographs (Def.'s Exs. 1A, 1B, 1C) of the Chrysler. As with the identification of defendant in

9

front of the Gaskins' residence, the poor image quality of the Video alone precludes it from discrediting the other evidence substantiating the officers' identification of defendant on Ward Boulevard.

As to Wiggs' testimony, he stated that in the course of filming the Video another car passed him travelling rapidly in the same direction on Ward Boulevard, a four-lane road, and he pursued it, but was unable to see the other car's driver well enough even to discern the driver's race or sex. (Tr. 145:25 to 147:20; *see* Video 02:02-03:10). However, the other car did not pass Wiggs' car until both cars had gone past Ward's Steak and Cheese (Tr. 145:25 to 146:15; *see* Video 02:02-02:04), the restaurant in front of which the officers pulled alongside the Chrysler and identified defendant inside (Tr. 22:10 to 23:25). Wiggs did not catch up to the other car until both reached the intersection of Ward Boulevard and Black Creek Road, several blocks beyond the restaurant. (Tr. 147:8-20; *see* Video 02:20-02:23). The Video shows these areas of Ward Boulevard past the restaurant, and particularly the area just beyond Black Creek Road where Wiggs continued to pursue the other car, to be noticeably less well lit than the area in front of the restaurant. (Video 02:28-03:10). Moreover, Wiggs maintains a significant distance behind the other car throughout the course of the Video, and never pulls alongside it to look inside, as the officers testified that they did with the Chrysler. (*See* Tr. 19:24 to 20:3; 20:16-22; 21:17 to 22:2; 63:18-22; 79:7-19; Video 02:02-03:10).

Wiggs also testified that while photographing the Chrysler he could see into it well enough to determine that it was occupied, but not well enough to identify the occupant. (Tr. 126:8-13). But one of the photographs reveals sufficient visibility through the Chrysler's rear, side windows to enable a license plate on a nearby car to be seen through them. (*See* Def.'s Ex. 1A). There was also enough visibility to be able to see through the windshield a law

enforcement-related sticker on the back window. (Gov.'s Ex. 11; *see* Tr. 31:6 to 32:7). Accordingly, the court rejects defendant's challenge to the officers' identification of defendant and finds that the officers had reasonable suspicion that defendant was in the Chrysler before initiating the traffic stop.

Having located and arrested defendant on the outstanding warrant pursuant to a lawful traffic stop, the officers' search of defendant on Ward Boulevard was valid under the incident-to-arrest exception to the warrant requirement. *See Chimel v. California*, 395 U.S. 752, 762-63 (1969) ("When an arrest is made . . . it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."). The further search at the police station which uncovered the handgun was likewise justified. "Correctional officials have a significant interest in conducting a thorough search as a standard part of the intake process." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 132 S. Ct. 1510, 1518 (2012). Accordingly, the portion of defendant's motion to suppress based on propriety of the traffic stop should be denied.

## II. THE *MIRANDA* WAIVER

### A. Applicable Law

The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. To protect this right, the Supreme Court in *Miranda* established rules governing custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). *Miranda* requires that, prior to questioning, a suspect who is in custody must be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so

desires." *Id.* Questioning may proceed only if the person lawfully waives his rights. *Id.* *Miranda* conditions the admissibility at trial of any custodial statements on compliance with the warning procedure. *Id.* "'[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.'" *United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005) (quoting *Missouri v. Seibert*, 542 U.S. 600, 608 (2004)).

The inquiry into the validity of a waiver has two distinct elements. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The court must determine, first, whether it was voluntary and, second, whether it was knowing and intelligent. *Id.* This determination is to be made based on the "'totality of the circumstances surrounding the interrogation.'" *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The government has the burden of proving the existence of both elements by a preponderance of the evidence, *United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005), and "that burden is a heavy one, requiring convincing evidence," *United States v. Grant*, 549 F.2d 942, 946 (4th Cir. 1977), *vacated on other grounds sub nom. Whitehead v. United States*, 435 U.S. 912 (1978).

### B. Analysis

Defendant contends that the government has not met its burden of showing that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. In making this argument, defendant emphasizes that the Wilson Police Department's *Miranda* form does not demonstrate either defendant's refusal to sign or his affirmative waiver. He argues that his willingness to sign the recording declination form the following day is inconsistent with the officers' testimony that defendant refused to sign the *Miranda* waiver but was nonetheless willing to cooperate. The court disagrees.

12

While mere silence is not sufficient to establish waiver, there is no requirement that *Miranda* rights be waived expressly. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979). In *Butler*, the Court considered a case where, as here, defendant was read his *Miranda* rights from a form, indicated that he understood, and advised the agents questioning him that he would talk to them, but refused to sign the form. *Id.* at 370-71. The Court rejected the North Carolina Supreme Court's position that *Miranda* could only be satisfied by a specific waiver, stating that "[t]he question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Id.* at 373. The Fourth Circuit has subsequently held that "[a] defendant's willingness to answer questions after acknowledging he understands his *Miranda* rights constitutes an implied waiver of those rights." *United States v. Adams*, 462 F. App'x 369, 377 (4th Cir. 2012) (citing *United States v. Cardwell*, 433 F.3d 378, 389-90 (4th Cir. 2005)).

At the hearing, Seagroves and Corprew both testified that defendant indicated to them that he understood every component of the *Miranda* warning. (Tr. 88:11-17; 98:17-18). They testified that defendant subsequently expressed a desire to cooperate with them (Tr. 98:19-22; 103:24 to 104:4) and that he did so voluntarily, without any threat or coercion. (Tr. 88:25 to 89:18; 102:22 to 103:19; 116:5-19). The *Miranda* form itself is filled out in a manner consistent with the officers' testimony. Specifically, the form is dated and signed by the officers, and the space after each component of the *Miranda* warning contains the word "yes" written by Corprew, followed by a slash to create a space for defendant to sign his initials, but no initials are signed. (Gov't's Ex. 10; *see* Tr. 100:8 to 102:12).

The court is not persuaded by defendant's argument that his willingness to sign the recording declination form the day after his arrest is inconsistent with the officers' testimony that

13

he was willing to speak with the officers but not to sign the *Miranda* form the previous night. It is entirely consistent for a defendant to be wary of signing a *Miranda* waiver for fear of accidentally incriminating himself, while at the same time being willing to sign a document denying police permission to record his statements. Defendant has not adduced any evidence to suggest that he did not understand his rights, or that he did not willingly cooperate with the officers after receiving the *Miranda* warning.

The court concludes that defendant's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. The portion of his motion to suppress based on *Miranda* should accordingly be denied.

## CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that defendant's motion to suppress (D.E. 59) be DENIED in its entirety.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until 16 June 2016 to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review**

**of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

Any response to objections shall be filed within 14 days after the filing of objections.

SO ORDERED, this 2nd day of June 2016.

James E. Gates
United States Magistrate Judge